Christopher J. Sullivan (CJS 3761)
Elliott M. Kroll (EMK 9953 )
Alan R. Lyons (ARL 0917)
HERRICK, FEINSTEIN LLP
2 Park Avenue
New York, New York  10016
(212) 592-1400

**Attorneys for Plaintiff**
**Lazare Kaplan International Inc.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

LAZARE KAPLAN INTERNATIONAL INC.,      :
                                       :
                    Plaintiff,         :
                                       :       Civil Action No. 1:10-CV-3615-AKH
          - against -                  :
                                       :       **FIRST AMENDED COMPLAINT**
SWISS RE INTERNATIONAL SE, UK          :
BRANCH, SR INTERNATIONAL BUSINESS      :
INSURANCE COMPANY LIMITED, CERTAIN :          **JURY TRIAL**
UNDERWRITERS AT LLOYD'S (Syndicates    :       **DEMANDED**
1414, 2488, 3210, 457, 2001 and 1084), and THE :
MARINE INSURANCE COMPANY LIMITED,  :
                                       :
                    Defendants.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

      Plaintiff Lazare Kaplan International Inc. ("LKI" or "Plaintiff"), by its attorneys,

Herrick, Feinstein LLP, for its First Amended Complaint against Defendants, alleges as follows:

## NATURE OF THE ACTION

      1.      This is an insurance coverage action in which Plaintiff seeks declaratory

relief pursuant to 28 U.S.C. § 2201(a), damages for breach of two "all risk" property insurance

policies, damages for breach of an Agreement for Interim Payment, damages for breach of the

implied covenant of good faith and fair dealing, and specific performance and/or damages for breach of a Confidentiality Agreement.

2.     Plaintiff paid Defendants premium under two "all risk" worldwide insurance policies, sustained losses covered thereunder, fully complied with all terms and conditions of those policies including giving timely notice of such losses to Defendants, fully cooperating with Defendants' investigation of those losses, and timely providing Defendants with all relevant information and documentation respecting those losses.  On December 31, 2009, Plaintiff also executed an Agreement for Interim Payment deferring litigation against Defendants for those losses to afford Defendants additional time to investigate those losses in return for: (a) payment of "Sue and Labor" expenses incurred by Plaintiff; (b) an interim payment of $28 million that was expressly "for an amount less than the total amount of all losses sustained by LKI recoverable under the Global Policies"; and (c) agreement by Defendants to provide Plaintiff with a determination of coverage on or before May 3, 2010. Plaintiff has complied with all of its obligations under the Agreement for Interim Payment.  However, Defendants have wrongfully and unreasonably failed and refused to acknowledge coverage (not even for the $28 million previously paid by Defendants under the Agreement for Interim Payment) or pay any covered losses under the insurance policies, and have further breached the Agreement for Interim Payment by failing to fully reimburse Plaintiff for Sue and Labor expenses.

## PARTIES

3.     Plaintiff LKI is a corporation engaged in the diamond business.  Its principal place of business is 19 West 44th Street, New York, New York.  LKI has been in

business for over 100 years.  It is one of the largest manufacturers and traders of diamonds in the United States, and is engaged in the cutting and polishing of diamonds that it sells to retail jewelers throughout the United States and abroad.  LKI's stock has been publicly listed since 1972 and remains the only corporation specializing in diamond manufacturing whose shares are publicly listed on a United States stock exchange.

4.      Defendants, Swiss Re International SE, UK Branch, SR International Business Insurance Company Limited (Swiss Re International SE, UK Branch and SR International Business Insurance Company Limited collectively "Swiss Re"), Certain Underwriters at Lloyd's (Syndicates 1414, 2488, 3210, 457, 2001 and 1084), and The Marine Insurance Company Limited are alien insurance companies, who are not domiciled in the State of New York.  Defendant insurers are required to post security.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 based on the diversity of the citizenship of the parties, and the fact that the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.      In addition, this Court has personal jurisdiction over each of the Defendants by virtue of the fact that: (a) said Defendants offer and sell insurance to insureds who are domiciled in this district, and have committed acts and/or material omissions in this district which have caused and continue to cause Plaintiff grave harm in this district; and (b) because Defendants have consented to such exclusive jurisdiction under the terms of the insurance policies at issue, the Agreement for Interim Payment and a Confidentiality Agreement between the parties.

3

7.    This Court also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §2201 and 2202.

8.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a)(2) because LKI maintains its principal place of business in this district, and this district is where a substantial part of the events giving rise to the claims occurred.

## INSURANCE POLICIES

9.    Upon information and belief, at all times relevant to the allegations in this Complaint, Defendants engaged in, among other things, the trade of underwriting commercial insurance and issuing policies of insurance.

10.    At all times hereinafter mentioned, Defendants insured, made, issued and delivered in the state of New York "All Risk" policies of insurance to Plaintiff whereby and wherein Defendants agreed to insure Plaintiff against, inter alia, physical loss and/or damage to Plaintiff's property.

11.    Certain of the Defendants issued to Plaintiff Policy Number B0576GLYA472 (the "Global Primary Policy").

12.    The term of the Global Primary Policy was from March 1, 2006 to February 28, 2009 inclusive.

13.    Effective March 1, 2006 to February 28, 2009, Plaintiff purchased a second policy from certain of the Defendants bearing policy number B0576GLYB472 ("Global Excess Policy").

4

14.     The Global Excess Policy is a "following form" policy which provides:

WE THE UNDERWRITERS hereby agree, to the extent and in the manner hereinafter provided to indemnify the Assured against any such loss or damage occurring during the period specified in the Schedule caused by any peril covered by and defined in the Primary Policy number GLYA472.

* * *

3.  Except as otherwise provided herein this Policy is subject to the same terms, exclusions, conditions and definitions as are contained in or may be added to the Primary Policy prior to a happening for which a claim is made hereunder.

15.     The terms of the Global Excess Policy are co-extensive with the terms of the Global Primary Policy.   The Global Primary Policy and the Global Excess Policy are collectively referred to herein as the "Global Policies."

16.     The Global Primary Policy is an "all risk" policy which states, in part, as follows:

PERILS INSURED AGAINST:  Subject to the General Conditions of this Policy (J A Form) and to the Conditions and Exclusions set forth below, the undersigned Underwriters undertake to indemnify the above-mentioned Assured up to the sums insured and limits specified for all physical loss and/or damage occurring during the period of this Policy and *arising out of any cause whatsoever*, including Strikes, Riots and Civil Commotions . . . [Emphasis added]

17.     The property covered by the Global Primary Policy is:

Precious Stones, cut or rough, set or unset of any sort or kind whatsoever, . . . Coins, Cheques, Bills and the like . . . whether the same be the property of the said Assured or entrusted to them, on sale or return or on approval or for work to be done thereon, or for safe custody or for any other purpose whatsoever.

5

18.     The applicable limit of liability under the Global Primary Policy is $10 million per loss, not in the aggregate.  The applicable limit "for each and every loss for entrustments to D D Manufacturing N.V. their subsidiary and associated companies" is $10 million.

19.     The territory covered by the Global Primary Policy is "Worldwide."

20.     The Global Primary Policy defines "Assured" as follows:

LAZARE KAPLAN INTERNATIONAL INC. and/or LEON TEMPELSMAN AND SON and/or LJ Superabrasives Holdings Inc and/or Diamond Innovations and/or PEGASUS OVERSEAS LIMITED and/or POCL BVBA and/or Bellataire International LLC and/or Bellataire LLC and/or Bellataire Domestic LLC and/or Bellataire BVBA and/or Nozala Diamonds (Pty) Limited their affiliated and subsidiary companies and successors as now exist or may hereafter be constituted.

21.     There is no provision in the Global Primary Policy which in any way limits the "Perils Insured Against" clause which provides coverage for "physical loss and/or damage . . . arising out of any cause whatsoever."

22.     "Territorial Limitations" in the Global Primary Policy states, "Worldwide".  Defendants expressed their intent that coverage was provided for all the operations of all the "assureds" without geographical limitation.

23.     The Global Primary Policy contains a "Basis of Valuation" provision which provides in part as follows:

10.3  Basis of Valuation

It is understood and agreed that losses, if any, shall be adjusted as follows:

6

    \*      \*      \*

(iv) . . .

    b)      Goods sold but not yet paid for:  Assured's selling price.

24.    The Global Primary Policy contains the following condition:

10.7    This contract is a first loss insurance and the Underwriters waive the application of a Co-insurance Clause.

25.    The Global Primary Policy contains certain exclusions, none of which is applicable.

26.    Pinnacle Ltd. ("Pinnacle"), a Bermuda corporation, is a wholly owned subsidiary of LKI and owns 100% of the shares of Serenity 2 Ltd. ("Serenity").

27.    Serenity, a Bermuda corporation, is an indirect wholly-owned subsidiary of LKI.  Serenity owns a 30% interest in Gulfdiam DMCC ("Gulfdiam"), a corporation incorporated in Dubai, United Arab Emirates.  Gulfdiam is thereby affiliated with LKI.

28.    Lazare Kaplan Belgium, N.V. ("LKB"), a Belgium corporation, is an indirect subsidiary of LKI.

29.    LKI, Pinnacle, Serenity, LKB and Gulfdiam are "Assureds" under the Global Policies and each has an insurable interest in the property covered thereunder.

30.    LKI has the sole and unconditional right under the Global Policies to tender losses both in respect of its interests as well as for the interests of its affiliated and subsidiary companies, including Pinnacle, Serenity, LKB and Gulfdiam.

31.    The Global Policies state that they shall be governed by the laws of the State of New York and that any dispute between the parties shall be subject to the exclusive jurisdiction of the Courts of New York.

32.    In addition to submitting the losses under the Global Policies, which provide worldwide coverage to Plaintiff, Plaintiff also submitted certain of the losses under two additional "all risk" policies in which Plaintiff and Gulfdiam are insureds: policy numbers B0576GMYA96B (for the period August 1, 2007 to September 30, 2008) and B0576GNYA96B (for the period October 1, 2008 to September 30, 2009) (collectively, the "Angola Policies"). All of the Defendants, except Lloyd's syndicates 1414 and 1084, subscribed to the Angola Policies in addition to subscribing to the Global Policies, and such Defendants represent approximately 80% of the subscription to coverage under the Angola Policies (the "Joint Policies Defendants"). Swiss Re is the "Lead" insurer on both the Global Policies as well as the Angola Policies. The Angola Policies cover "all risks of physical loss or damage" to rough diamonds "from whatever cause arising".   The Angola Policies are governed by the laws of England and Wales and are subject to the exclusive jurisdiction of the Courts of England and Wales. The Angola Policies provide extremely broad coverage and contain no relevant exclusions.

33.    The Joint Policies Defendants created a virtual coverage "Whipsaw" by denying coverage under the Angola Policies on the basis that, *inter alia*, LKI does not have an insurable interest in the largest portion of the property at issue, while at the same time asserting under the Global Policies that there is no coverage because LKI insured the very same property under the Angola Policies.  This egregious "heads I win, tails you lose" approach bears no

relationship to the wording of the policies but rather is a fiction created by those Defendants to deprive LKI of the insurance benefits to which it contracted and paid for.

34.     This Whipsaw created by the Joint Policies Defendants is impossible for those insurers to defend in view of their payment under and statements within the Agreement For Interim Payment.

35.     Although, Plaintiff is seeking relief in this action against the Defendants only in respect of the Global Policies, the Agreement For Interim Payment and a Confidentiality Agreement, it also seeks damages herein from the Defendants for their wrongful refusal to timely and thoroughly investigate these losses and in particular from the Joint Policies Defendants for their creation of the Whipsaw depriving LKI of insurance proceeds to which it is contractually and legally entitled.  Plaintiff reserves any and all of its rights to proceed under and against the Angola Policies.

## THE LOSSES

36.     As set forth below, the total value of the losses sustained by Plaintiff is in excess of USD One Hundred And Forty Million ($140,000,000.00).

37.     Rough  diamonds  from  Angola  come  from  two  different  sources: industrial scale mines, known as the "Formal Sector," and local artisanal sellers, known as the "Informal Sector," who mine diamonds from smaller, non-industrial scale operations.

A. (i)   <u>Angola  Formal Sector</u>

38.     Gulfdiam was organized for the purpose of buying rough diamonds in the Formal Sector from GemAng Diamantes Angola, Limited ("GemAng") in Angola and selling them to buyers worldwide.

39.     In connection with Serenity acquiring its interests in Gulfdiam, LKI agreed to guarantee the payment of certain debts owed by Gulfdiam to its lender, ABN AMRO Bank N.V. ("ABN").

40.     The claim for losses from the Formal Sector arises from nine shipments in 2008 while the Global Policies were in full force and effect.  With respect to each of the nine shipments, Gulfdiam made itemized wire transfers to GemAng's bank account for the specific purpose of GemAng using those funds to purchase large shipments of rough diamonds which were ultimately shipped to Gulfdiam in Dubai.

41.     Gulfdiam subsequently consigned the diamonds to one of three customers -- Gemport DMCC ("Gemport") in Dubai, A.D. Middle East FZE ("ADME") in Dubai, and Overseas Diamond Hong Kong Ltd. ("ODHK") in Hong Kong -- and delivered the diamonds to such customers.

42.     Gulfdiam paid for the purchase of rough diamonds from GemAng in the Formal Sector from retained earnings and by drawing against a $50 million credit facility with ABN.

43.    Between July and October 2008, Gulfdiam purchased in excess of $108 million of diamonds from GemAng in Angola, using, in part, the money it borrowed under its credit facility with ABN.

44.    Gulfdiam delivered approximately $80 million of diamonds to Gemport. Gemport did not pay for most of the diamonds it received from Gulfdiam. Neither Plaintiff nor any of its subsidiaries or Gulfdiam, have any ownership interest in or control over Gemport.

45.    All diamonds delivered to Gemport by Gulfdiam were provided on the expressly stated condition that "until **full** receipt of payment of this document the mentioned merchandise will be considered *in consignment and remain our exclusive property*." (Emphasis added).

46.    The specific invoices at issue are described below:

| Invoice Date | Invoice # | Invoice Amount | Amount Outstanding | Due Date Of Invoice |
|---|---|---|---|---|
| 07/27/08 | 08/021 | $26,404,350.00 | $ 6,208,880.34 | 08/27/08 |
| 08/06/08 | 08/022 | $17,669,840.00 | $17,669,840.00 | 09/05/08 |
| 08/21/08 | 08/023 | $ 2,339,966.00 | $ 2,339,966.00 | 09/20/08 |
| 09/28/08 | 08/026 | $ 1,249,319.00 | $ 1,249,319.00 | 11/27/08 |
| 09/28/08 | 08/027 | $32,058,101.00 | $32,058,101.00 | 11/27/08 |
| | | **$79,721,576.00** | **$59,526,106.34** | |

47.    Gemport owes **$59,526,106.34** for the diamonds reflected in the foregoing invoices. As expressly stated in Gulfdiam's invoices, the diamonds delivered to Gemport remain the property of Gulfdiam until full payment is received. Without receipt of payment for the diamonds, or the return of the diamonds, (a) Gulfdiam remains liable to satisfy the loan from

11

ABN or to satisfy its other obligations to its shareholders, including Serenity and (b) LKI remains exposed to claims of ABN to satisfy the guarantee of the Gulfdiam loan.  Gulfdiam has made written demand upon Gemport for the above amounts or return of the diamonds; however, Gulfdiam did not receive any payment or the diamonds.

48.     In addition to the diamonds that Gulfdiam invoiced to Gemport, Gulfdiam delivered approximately $37.6 million in diamonds directly to ODHK and ADME for which Gulfdiam has been paid only a small portion.

49.     Specifically, Gulfdiam delivered approximately $17.3 million of diamonds to ODHK on October 26, 2008 for which Gulfdiam has not been paid in whole or in part.  The specific invoices at issue between Gulfdiam and ODHK are described below:

| Invoice Date | Invoice # | Invoice Amount | Amount Outstanding | Due Date Of Invoice |
|---|---|---|---|---|
| 10/26/08 | 08/028 | $16,058,922.56 | $16,058,922.56 | 12/25/08 |
| 10/26/08 | 08/029 | $ 1,240,101.67 | $ 1,240,101.67 | 12/25/08 |
| | | **$17,299,024.22** | **$17,299,024.22** | |

50.     Gulfdiam delivered approximately $20.3 million of diamonds to ADME on September 24, 2008, and has not received payment for $17.3 million of those diamonds.  The specific invoices at issue between Gulfdiam and ADME are described below:

| Invoice Date | Invoice # | Invoice Amount | Amount Outstanding | Due Date Of Invoice |
|---|---|---|---|---|
| 09/24/08 | 08/024 | $19,047,659.36 | $16,047,659.36 | 11/23/08 |
| 09/24/08 | 08/025 | $ 1,274,632.73 | $ 1,274,632.73 | 11/23/08 |
| | | **$20,322,292.09** | **$17,322,292.09** | |

51.     Like the invoices sent by Gulfdiam to Gemport, all invoices from Gulfdiam to ADME and ODHK expressly stated that: "Until full receipt of payment of this document the mentioned merchandise will be considered *in consignment and remain our exclusive property*." (Emphasis added).

52.     Thus, ADME and ODHK collectively owe Gulfdiam **$34,621,316.31**. Gulfdiam has made written demand upon each of ADME and ODHK for the above amounts or return of the diamonds; however, Gulfdiam did not receive any payment or the diamonds.

53.     Gulfdiam does not have control over the diamonds that have been delivered to Gemport, ADME and/or ODHK and does not know the current whereabouts of the diamonds despite its extensive efforts to locate them and obtain payment.

54.     Plaintiff and Gulfdiam have suffered a fortuitous, physical loss of those diamonds and any proceeds thereof.

A. (ii)  <u>Angola Informal Sector</u>

55.     LKI had sole title to the diamonds in the "Informal Sector" that are the subject of these losses.  In the Angolan Informal Sector, LKI made cash purchases of diamonds from local Angolan diamond sellers who mine diamonds from smaller (non-industrial) scale alluvial operations.

56.     With respect to the transactions at issue in this litigation, in LKI's "Informal Sector" operation, each LKI local buying office used cash it received from LKI's New York office to purchase rough diamonds from local diamond sellers.   LKI purchased approximately $28.2 million of diamonds in the "Informal Sector" during the relevant time

period (May 2008 to November 2008). LKI's local buying offices then shipped the diamonds to Belgium, in sealed boxes, by bonded and secured carriers employed by Brinks. LKI's subsidiary in Belgium, LKB, then accepted and cleared the importation of the diamonds into Belgium.

57.    Between June and October 2008, LKB delivered these rough diamonds to two Belgian corporations that are closely linked, DD Manufacturing NV ("DD") and KT Collection Bvba ("KT"), in Antwerp, Belgium to sell to third parties. DD and KT signed a consignment note under which LKB (acting for and on behalf of LKI) retained title to the diamonds. DD or KT would then report back to LKB when they invoiced the diamonds to a third party at which time LKB would send an invoice to DD or KT for the amount due and LKI would invoice LKB.

58.    LKB sent invoices to DD and KT for the diamonds that DD and KT had reported to LKB as having been sold to third parties. On June 30, 2008 and July 24, 2008, LKB issued two invoices to KT totaling $11,618,294.00, and from September 18, 2008 through October 31, 2008, LKB issued four invoices to DD totaling $12,770,253.16. Thus the total owed to LKB by DD and KT for such Informal Sector diamonds is $24,388,547.16 (excluding interest and indemnity). Neither DD nor KT paid LKB or LKI for any of the amounts invoiced for the diamonds.

59.    In addition, DD has not returned to or paid LKB $4,073,210.00 for the diamonds that it held on consignment. LKB is therefore unable to pay LKI for its invoice for these diamonds

60.    Demand letters have been sent to both DD and KT demanding payment of the unpaid due and payable invoices.

61.    To date, LKI has not received the invoiced amounts, the interest and fees due thereon, or the return of the unsold diamonds.

62.    Each of the LKB invoices with respect to those diamonds contained the following condition:

> In deflection of art. 1583 Belgian Civil Code, parties agree that the property of the merchandise referred to in the invoice will only be transferred to the buyer after full payment of the invoice, incl. Interest and taxes.  Failing payment seller is entitled to repossess the merchandise, failing payment, wherever the merchandise is located at that time.

63.    Accordingly, in the absence of full payment of the invoice, LKB (as LKI's agent) has retained title to the diamonds but no longer has control over them and has similarly suffered a fortuitous physical loss of the diamonds.

### A. (iii) Rough Diamond Trading China ("RDTC") Losses

64.    The management of Gulfdiam negotiated an additional commercial off-take agreement involving Formal Sector rough diamonds.  In accordance with the exclusivity provisions of a shareholders agreement dated May 16, 2006 signed by the shareholders of Gulfdiam, the RDTC business was to be carried out for the benefit of the shareholders of Gulfdiam.  The shareholders agreed that management responsibility and financing of purchases of the RDTC venture would be provided directly or indirectly by DD and/or their subsidiary and/or associate companies.

65.    The management responsibilities entrusted to DD by the shareholders included: (1) evaluating and negotiating the purchase price of the rough diamonds offered; (2) handling negotiations and the logistics of the sale of the diamonds to third parties; (3) reporting

the sales price to the shareholders; (4) funding the purchase of the diamonds; and (4) paying the shareholders their respective share of RDTC profits.

66.    Pursuant to this agreement, upon information and belief, Gemport obtained a loan from I.C.I.C.I. Bank to fund the RDTC purchase between July 2007 and June 2008, during the term of the Global Policies.

67.    Upon information and belief, Gemport also maintains bank accounts at ABN that it used for a material portion of these transactions.

68.    Upon information and belief, Gemport sold the diamonds to third parties for which LKI has not received payment of its 30% interest in an amount of no less than $7,181,444.84.

B.    Sight Losses

69.    In addition to purchasing rough diamonds in the Formal and Informal sectors, LKI also purchases diamonds from elsewhere in the world, including directly from certain mining companies (the "Sight Rough").

70.    LKI purchased approximately $14 million of Sight Rough from August 2008 through October 2008. With respect to such diamonds, LKI followed a process similar to that followed with respect to the Informal Sector Angolan diamonds. That is, LKI delivered the diamonds to LKB, which in turn consigned the diamonds to DD. When DD sold the diamonds, LKB issued invoices for the corresponding amount and DD was required to remit the proceeds from such diamonds to LKB. LKB would then remit such proceeds to LKI.

71.    After receiving notice from DD that it had sold the diamonds, LKB, on August 31, 2008 and October 30, 2008, invoiced DD $6,951,419.90, and $6,935,698.58, respectively for a total of $13,887,118.48, representing LKI's gross interest in the proceeds of such diamonds.

72.    LKB has sent a demand letter to DD demanding payment of the unpaid due and payable invoices or a return of the diamonds.

73.    To date, LKI has not received the invoiced amounts or the interest and fees due thereon, or a return of the diamonds.

74.    In the absence of payment, LKI has retained title to the diamonds but no longer has control over them and has similarly suffered a fortuitous physical loss of the diamonds and the proceeds thereof.

75.    All relevant documents relative to the Sight Losses were provided to Defendants' original adjuster, Peter Montalbano ("Montalbano"), no later than August 2009 and again to Defendants' original counsel retained to represent Defendants under the Global Policies ("Original Global Counsel") in April 2010.

C.    Namibian Losses

76.    An LKI subsidiary, NamGem Trading, is a sightholder in Namibia and, as such, is one of a select group of companies allowed to directly buy Namibian rough diamonds.

77.    The agreement and practice, by which the diamonds were acquired, manufactured and ultimately sold to third party customers was to operate as follows:  LKI would pay the purchase price, acquire title to the diamonds and arrange for the delivery of the diamonds

17

to the factory.  The diamonds were then planned, cut and manufactured in Namibia, and certain of the diamonds were shipped from Namibia to specialty manufacturers in Israel and Belgium to be remanufactured and finally finished in order to obtain the best possible manufacturing yield and optimize the value for those stones.  Once the diamonds were finally finished, they were to be shipped to DD on consignment for DD to sell to third parties.  Once DD sold the diamonds to a third party, DD was to report back to LKI the specific details of the sale transaction.  LKI was to invoice DD with respect to the sale of the diamonds and the resulting net profits.

78.     Between September 2007 and October 2008, during the term of the Global Policies, diamonds were shipped from the Namibian facility to (a) DD's office in Antwerp, and (b) specialty manufacturers in Israel and Belgium for remanufacturing and final finishing. Stones exported for further manufacturing, once finished, were returned by those manufacturers to DD to sell to third parties.

79.     DD reported to LKI that it had sold some of those stones for $14,836,674.71.  LKI has not been paid in whole or in part for its interest in the sales proceeds of such stones.

80.     Upon information and belief, in addition, there is $10,015,509.76 of inventory (rough cost plus manufacturing overhead) for which DD has not accounted to LKI, and which are now fortuitously physically lost to LKI.  LKI has not received any payment for its interest in such inventory.

## DEFENDANTS' FAILURE TO CONDUCT A GOOD FAITH INVESTIGATION INTO THE LOSSES

81.     The above-referenced losses under the Global Policies were timely reported to Defendants, through Plaintiff's brokers.   At the same time, the same losses were also reported to Defendants subscribing to the Angola Policies.   As set forth above, all of the Defendants, except Lloyd's syndicates 1414 and 1084, subscribed to the Angola Policies in addition to subscribing to the Global Policies.

82.     From April 3, 2009 through July 2009, LKI provided Defendants voluminous information and documentation regarding the losses.   In late July 2009, Plaintiff supplied voluminous data and documentary evidence to Montalbano, an adjuster jointly appointed by Defendants and those insurers subscribing to the Angola Policies, and spent several days with him explaining in great detail and precision, to the extent known to LKI, the circumstances of the losses. The documents and other information that LKI provided to the Defendants were relevant to both the Global Policies and the Angola Policies as these losses were covered under both sets of policies.   Montalbano had previously adjusted other losses that LKI had sustained over the course of several years under its global insurance program and knew the bona fides of LKI and its senior officers.  Montalbano knew that LKI worked hard to mitigate losses and recover lost property.

83.     Rather than allowing Montalbano to conduct a full and thorough investigation, sometime between July and September 2009, Defendants removed Montalbano from adjusting the losses, and instead retained a separate adjuster, Denise Oliver.  Denise Oliver told LKI in September 2009 that she would conduct interviews with personnel from DD and KT. Denise Oliver acknowledged to Plaintiff that she had not met or spoken with Montalbano and

19

indicated that she had no intention of doing so before conducting interviews with DD and KT. Plaintiff implored Denise Oliver to meet with Montalbano and/or meet with Plaintiff directly to facilitate a thorough understanding of the claims. Denise Oliver declined. Upon information and belief, at the direction of the Defendants, she did not conduct interviews with personnel from DD or KT and did nothing further to investigate these losses.

84.     From April 2009 through December 2009, Plaintiff met with Defendants directly on several occasions to explain the nature of the losses and answer their questions and provided them with voluminous relevant documentation to support the losses. Regardless of LKI's numerous efforts to urge Defendants to immediately investigate these losses, upon information and belief, between late August 2009 and December 31, 2009, Defendants did not thoroughly investigate these losses, while refusing to pay LKI for its insured losses, thereby exacerbating the damage to LKI, with full knowledge that:

(a) LKI is a public company, listed on the American Stock Exchange;

(b) these losses were and are material to LKI's financial stability; and

(c) LKI's ability to report financial information and issue financial statements to its banks and to securities regulators would be compromised as a direct result of Defendants' breach of their obligations to LKI.

85.     On October 15, 2009, Plaintiff demanded that Defendants provide prompt and unequivocal assurance that Defendants have accepted liability under the Global Policies and Angola Policies for the losses Plaintiff has or will incur.   No such assurance was forthcoming.

86.    Despite Plaintiff's efforts and its repeated requests for an acknowledgement by Defendants that the losses are covered under the Global Policies and Angola Policies, Defendants refused to acknowledge coverage and failed to investigate the losses in a timely and reasonable manner.

87.    On November 24, 2009, a forensic accounting firm retained by Defendants, RGL Forensics ("RGL"), wrote to counsel for Plaintiff and requested the scheduling of a meeting with an employee of Plaintiff during the week of December 14, 2009, and set forth 30 separate questions (not including all of the subparts) to be responded to by Plaintiff before the proposed meeting.   In that letter, RGL requested information and documentation that, upon information and belief, it knew or should have known was irrelevant, burdensome, not required by the terms of the Global Policies and/or not within Plaintiff's possession or control.

88.    On December 23, 2009, LKI met with RGL and Original Global Counsel for Defendants, and provided reams of documents respecting these losses for Defendants' review and consideration.   LKI spent an entire day with RGL, providing documents to RGL that LKI had previously provided to Montalbano, answering any and all questions that were posed.

89.    For the first time in its over 100-year existence, LKI was facing economic hardship by reason of these large losses and insurers' refusal to timely investigate and pay LKI. LKI communicated to the insurers under both the Global Policies and the Angola Policies that it would be forced to commence suit if it did not receive a substantial interim payment prior to December 31, 2009, the date by which it would be delisted by the American Stock Exchange.

90.    The insurers subscribing to the Angola Policies were not concerned because their view was that under the laws of the United Kingdom, their liability to LKI was limited to contractual damages for breach. The Defendants, however, were cognizant of the risk that LKI could seek consequential damages under the Global Policies pursuant to New York law. In recognition of that risk, Defendants commenced negotiations during the last week of 2009 to make an interim payment to LKI, reimburse LKI for its Sue and Labor and provide their coverage determination by May 3, 2010 in return for a waiver by LKI of consequential damages that would otherwise be sought by LKI from Defendants under the Global Policies in the event of litigation.

91.    On December 31, 2009, LKI and Defendants entered into an Agreement For Interim Payment whereby Defendants made an interim payment (as defined therein) in the amount of $28,000,000.00 but only in respect of their capacity as subscribing insurers under the Global Policies.

92.    At the same time, the Joint Policies Defendants were considering whether to provide coverage to LKI under the Angola Policies.  On January 5, 2010, counsel for the insurers subscribing to the Angola Policies ("Angolan Counsel") wrote to LKI refusing to pay under the Angola Policies having conducted no investigation but still questioning whether the diamonds in question ever existed.  At the same time, Angolan Counsel requested that LKI prepare what Angolan Counsel termed a "Statement of Claim" asserting that it was for the express purpose of questioning DD and KT and their principals respecting these losses. Despite the refusal of the Joint Policies Defendants (including Defendant Swiss Re which is the lead insurer under both the Global Policies and the Angola Policies) to acknowledge coverage under

the Angola Policies and the fact that none of the policies issued by the Defendants had any requirement of a "Statement of Claim", LKI continued to cooperate and set about preparing the requested "Statement of Claim" at considerable time and expense not knowing that Defendants would instead use this Statement of Claim as a basis to wrongfully avoid coverage under the Global Policies.

93.     Thereafter on January 14, 2010, LKI met with both Original Global Counsel and Angolan Counsel in New York, spending the entire day, once again, laying out in considerable detail the results of LKI's independent investigation into these losses that LKI was forced to maintain at a cost to LKI of millions of dollars by reason of the failure of Defendants to investigate these losses.   Plaintiff provided both Original Global Counsel and Angolan Counsel (as well as RGL Forensics who was also in attendance) with additional documentation of LKI's Sue and Labor activities respecting these losses for Defendants' review and consideration.

94.     Angolan Counsel, having heard the detail and precision of LKI's presentation, requested that LKI make the same presentation but this time directly to insurers subscribing to the Angola Policies including the Joint Policies Defendants.  On January 27, 2010 that is exactly what LKI did.  By January 27, 2010, Plaintiff had provided Defendants with all relevant documents and information respecting the Angola losses that were in the possession or control of the Plaintiff including the Kimberley Process Certificates for each shipment of diamonds.

95.     The Kimberley Process Certification Scheme (KPCS) imposes extensive requirements on its member countries (http://www.kimberleyprocess.com/).  There were Kimberley Process Certificates for all the shipments of diamonds in question in this case

demonstrating that the diamonds were inspected, evaluated and weighed before shipment. Upon request of Defendants, LKI at considerable effort, secured the Kimberley Process Certificates for each shipment despite the lack of any requirement in any of the subject policies that it do so. Despite providing the Kimberley Process Certificates, Angolan Counsel for the Joint Policies Defendants still wrote to LKI questioning whether the diamonds ever existed.

96.     Unlike the Global Policies, the definition of "Insured" under the Angola Policies includes DD "and/or their subsidiary and/or associate companies including but not limited to K.T. Collection Bvba and Gemport DMCC and the joint venture entities GemAng Angola Diamonds Lda . . . ." However, "B) Entrustments" in the Global Policies specifically referenced companies "associated" with DD, which by necessity includes Gulfdiam and Gemport.

97.     The Angola Policies contain the following condition:

EXAMINATION OF RECORDS

At the request of the Underwriters, the Insured shall submit to examination under oath and shall upon reasonable notice produce for examination at such reasonable time and place as may be designated by the Underwriters or their representatives, all documents in their possession or control which relate to the matters in question and shall permit extracts and copies to be taken.

98.     On numerous occasions, Plaintiff implored Defendants to immediately conduct an investigation of the losses, including that the Joint Policies Defendants immediately: exercise their contractual rights to: (a) conduct an examination under oath of personnel from DD, KT and Gemport; and (b) demand that DD, KT and Gemport produce all relevant documents in their possession or control regarding the losses. Angolan Counsel represented that the Joint

24

Policies Defendants would investigate these losses including questioning principals of DD and KT. LKI provided such Defendants with the names of specific individuals who had personal knowledge of the circumstances of the losses and literally pleaded such Defendants to speak with these witnesses.

99.    Upon information and belief, despite Plaintiff's repeated requests, the Joint Policies Defendants, through Angolan Counsel or otherwise, did not contact DD, KT or Gemport directly, did not exercise their contractual right to conduct an examination under oath, and did not exercise their contractual right to demand the production of such documents from DD, KT or Gemport.

100.    Upon information and belief, the Joint Policies Defendants did not conduct a thorough or timely investigation of these losses despite representations that they would do so. Their concept of investigation of the losses under the Angola Policies were limited to Angolan Counsel's representatives contacting LKI's staff members in Africa without prior notice to LKI and a belated trip to Dubai. Despite requesting in April 2010 that LKI assist such Defendants in arranging meetings with certain witnesses in Antwerp to facilitate the investigation of coverage under the Angola Policies, and despite the most senior officials of LKI personally promptly arranging the interviews requested, no one on behalf of the Joint Policies Defendants bothered to visit Antwerp much less contact or speak with the witnesses.

101.    Joint Policies Defendants however at the same time continued to demand from LKI documentation and information which they knew was either irrelevant or not in LKI's possession or control. Consistent with the Whipsaw that was about to be implemented by the Joint Policies Defendants, they made this request in order to create a fallacious basis upon which

25

to refuse to provide coverage under the Angola Policies. This was almost identical to a wrongful request for documents and information sent by Defendants' counsel at 8:00 p.m. on May 1, 2010 with respect to the Global Policies.

102.    Defendants knew that, as a result of their inadequate and untimely investigation and failure to pay the losses under the Global Policies or the Angola Policies, LKI was in danger of being de-listed from the American Stock Exchange.

## INTERIM PAYMENT AGREEMENT

103.    LKI and Defendants entered into an Agreement For Interim Payment as of December 31, 2009 whereby Defendants made an interim payment (as defined therein) in the amount of $28,000,000.00 but only in respect of their capacity as subscribing insurers under the Global Policies.   On February 24, 2010 LKI and Defendants entered into an Amendment to the Agreement For Interim Payment. The December 31, 2009 agreement and the February 24, 2010 Amendment are collectively referred to herein as the "Agreement."

104.    LKI at all times has complied with the Agreement.

105.    The Agreement defined "Interim Payment" as follows:

"Interim Payment" shall mean a payment made under and by reason of this Agreement *for an amount less than the total amount of all losses sustained by LKI recoverable under the Global Policies.* (Emphasis added).

106.    Under the terms and conditions of the Agreement, the parties defined "Sue and Labor" as follows:

"Sue and Labor" shall mean costs and expenses incurred by or on behalf of LKI to take such measures as were reasonable for the purpose of averting and mitigating its losses and to otherwise insure that its rights in respect of the Insured Interest were properly protected.

107.    The Global Policies do not define sue and labor.

108.    Defendants acknowledged in the Agreement that LKI timely submitted claims under the Global Policies losses to certain Insured Interests and that "LKI has incurred costs and expenses to investigate the circumstances of the losses and mitigate the losses as well as mitigate the consequential and collateral damage to LKI as a result of such losses."

109.    The Agreement also provided as follows:

**Except as otherwise specifically set forth herein**, this Agreement does not modify, alter or amend the Global Policies. (Emphasis added).

110.    The Agreement further provides:

In the event of any dispute between the Parties regarding the enforcement of this Agreement or any provision hereof, the Party prevailing in such dispute shall be paid all of its fees and costs, including attorney fees related to such dispute.

111.    The Agreement was amended on February 24, 2010 to provide that payment for Sue and Labor was due no later than March 17, 2010.

112.    LKI made its initial submission of Sue and Labor on February 8, 2010.

113.    Defendants requested the opportunity to interview one additional law firm and one consultant whose bills were submitted as part of LKI's initial Sue and Labor submission (the "Interviews"). Those interviews were completed by April 14, 2010. At no time prior to March 17, 2010 did anyone on behalf of Defendants raise any questions with respect to any of

27

the bills other than with respect to the Interviews. Prior to March 17, 2010, Original Global Counsel had had the unfettered opportunity to speak with and make inquiry of LKI personnel, U.S. counsel for LKI, Belgian counsel for LKB as well as Dubai counsel for LKI. All Sue and Labor payments on LKI's initial submission other than for the Interviews were due no later than March 17, 2010.

114.    Defendants entered into the Agreement to avoid the consequences of their failure to investigate and remit payment for Plaintiff's claims for losses under the Global Policies. Defendants were acutely aware of their liability to Plaintiff for not only contractual damages but also for consequential damages under New York law.

115.    On January 14 and January 27, 2010, as noted above, LKI made a comprehensive and detailed presentation to Defendants of the extensive global investigation that it was forced to maintain and expand, at its own expense, by reason of the failure of Defendants to timely investigate the losses of the diamonds and the proceeds from the sales thereof.

116.    Unbeknownst to LKI however, the Joint Policies Defendants had commenced suit in London against LKI on February 4, 2010 seeking a declaratory judgment under the Angola Policies. Over the following three months, the Joint Policies Defendants continued to seek information from LKI including access to key witnesses and documents without disclosing that they had filed litigation against LKI alleging, *inter alia*, that LKI did not have an insurable interest in the diamonds that had been physically lost.

117.    LKI meanwhile was cooperating to the fullest extent with Original Global Counsel. Pursuant to the Agreement, LKI traveled to Antwerp and Dubai with Original Global

Counsel, making arrangements in both locations so that Original Global Counsel could personally meet with and make unrestricted inquiry of all the pertinent witnesses in both of those venues as well as speak directly with LKI's Belgian counsel handling the litigation in that jurisdiction against DD and KT. Original Global Counsel also had the unrestricted opportunity during those trips to make such inquiry of senior management of LKI as they saw fit.

118.    Everything that LKI had been saying to Defendants consistently for almost one year respecting the facts and circumstances surrounding these losses was confirmed. Third-party witnesses corroborated all the information that LKI had presented, warranting immediate payment of the losses in question. LKI, cognizant that coverage under the Angola Policies is provided by the Joint Policies Defendants, made clear its willingness and desire that Original Global Counsel share their reports and findings (and that of their independent investigator) with Angolan Counsel.

119.    In early March 2010, Defendants moved Original Global Counsel to a new role as "recovery" counsel, retaining new coverage counsel for the Global Primary Policy ("New Global Counsel") as well as new coverage counsel for the Global Excess Policy ("New Global Excess Counsel").

120.    As noted above, Defendants had failed to investigate these losses, forcing LKI to maintain and expand its own Sue and Labor efforts, and Defendants had paid LKI $28 million under the Agreement in recognition of Defendants' exposure to consequential damages under New York law by reason of their contractual and legal breaches as of that date. Moreover, Angolan Counsel had such respect for LKI's Sue and Labor efforts as presented originally on January 14, 2010 that they wanted their clients' senior officers, including the Joint Policies

Defendants, to personally witness LKI's presentation of its Sue and Labor efforts, resulting in the presentation to such Defendants on January 27, 2010.

121.    The first communication that Plaintiff received from New Global Counsel was on March 17, 2010 which was a refusal to pay amounts due and owing under the Agreement for Sue and Labor.  Defendants materially breached the Agreement by failing and refusing to pay more than twenty percent (20%) of the Initial Sue and Labor submission.

122.    Defendants attempted to justify their breach first by arguing that they had no obligation to pay more than the percentage that the ratio of the Interim Payment compared to the total claimed amount for all losses.   The twenty percent (20%) ratio concept was a contrivance, unrelated to the terms of the Agreement which had no such allocation provisions. The amount of Sue and Labor which Defendants were obligated to pay was not contingent upon the amount of losses Defendants had agreed to insure.

123.    Defendants cited to inapposite case law and referred to the terms of the Global Policies, ignoring the definition of Sue and Labor under the Agreement.

124.    When LKI protested the failure of Defendants to pay the initial Sue and Labor submission, Defendants offered a new but contradictory explanation.  For the first time, almost one year after notification of these losses, Defendants advised in a casual footnote to its March 31, 2010 letter from New Global Counsel that, because LKI had submitted a Statement of Claim under the Angola Policies pursuant to a request of Angolan Counsel, eighty-five percent (85%) of the losses were not insured under the Global Policies, which it asserted supported its refusal to pay more than 20% of Sue and Labor.  At no time from when the losses were first

30

advised to Defendants until March 31, 2010 had Defendants ever taken the position or reserved their rights to disclaim coverage based upon the contention that eighty-five (85%) percent of the property in question ($122 million out of $140 million) was not insured under the Global Policies. At no time in the March 31, 2010 letter did New Global Counsel assert that any policy exclusions applied. This "85% solution" however was contrary to the express terms of the Agreement. Moreover, in that letter, Defendants did not delineate which property was, in their view, insured and which was not insured under the Global Policies. Defendants, relying upon this new "85% solution," claimed that they did not have to pay more than the arbitrary twenty percent (20%) of the initial Sue and Labor submission despite the fact that that the Agreement provides that the payment of the $28 million was for an amount "less than the total amount of all losses sustained by LKI recoverable under the Global Policies."

125.   This was the set up for the Whipsaw. Defendants knew that the Statement of Claim had been requested by Angolan Counsel to investigate the losses, and knew that Plaintiff had consistently taken the position that it was not seeking to recover more in the aggregate than the total loss that it had sustained. Despite this knowledge, Defendants refused to honor the terms of the Agreement and pay Sue and Labor due and owing to LKI.

126.   Defendants' conduct was and remains a material breach of the Agreement. Defendants were given the opportunity to cure that breach after the initial payment of twenty percent (20%) of a portion of the initial Sue and Labor submission. Rather than cure that breach, Defendants compounded that breach.

127.   When LKI submitted its second Sue and Labor, Defendants raised no additional questions of any nature, just paying twenty percent (20%), and did not question any specific billing entry or expense.

128.   Those Defendants subscribing to the Global Excess Policy, who are jointly and severally liable with those Defendants subscribing to the Global Primary Policy, paid LKI nothing for either Sue and Labor submission, despite demand for payment.  Those Defendants subscribing to the Global Excess Policy have consistently confirmed that the positions taken by New Global Counsel are applicable to and enforceable against the Global Excess Policy.

## DEFENDANTS' DENIAL OF COVERAGE UNDER THE GLOBAL POLICIES

129.   Defendants had an obligation under New York law to timely advise Plaintiff whether and to what extent they were going to provide coverage under the Global Policies.  However, having failed to do so in 2009, part of the consideration for the Agreement was that Defendants were allotted until no later than May 3, 2010 within which to complete an investigation and reach a coverage determination respecting Plaintiff's losses under the Global Policies.

130.   By letter dated May 3, 2010, New Global Counsel informed Plaintiff that "Underwriters have concluded based on the facts in hand that LKI has not met its burden to show that Underwriters are obligated at this time to make a payment under the policy."

131.   By letter dated May 3, 2010, New Global Excess Counsel informed Plaintiff that "Underwriters deny any obligation to make any payment to LKI" because "LKI has not established a covered loss under the Excess Policy."

32

132.    Each of the bases on which Defendants rely in refusing to acknowledge coverage under the Global Policies is contrary to the terms of the Global Policies and contrary to New York law.   Additionally, Defendants' May 3 letter denying coverage was littered with inaccurate, inconsistent and irreconcilable statements.   None of the positions taken by Defendants as a basis for denying coverage relate in any way to matters uncovered as a result of investigation conducted during the period December 31, 2009 through May 3, 2010, in which Defendants agreed to perform an investigation.   There was no reference to any of the documentation and information provided by Plaintiff to Montalbano in July and August 2009. Instead, frustrated by the incontrovertible proof of insured losses involving more than $140 million all of which was consistent with representations of Plaintiff, Defendants reduced Original Global Policy Counsel's role to that of "recovery counsel" and retained New Global Counsel to attempt to rewrite history and ignore contractual obligations.

133.    Defendants subscribing to the Global Primary Policy, in denying coverage in its letter of May 3, 2010 said, "LKI says it is entitled to recover from Underwriters because Gulfdiam sold Angolan diamonds and did not account to LKI for its investor share."  LKI never made any such statement.

134.    Such Defendants also stated in that same letter that "…LKI had credit risk insurance in effect during 2008."  LKI never made any such statement and, in fact, had no such credit risk insurance in effect in 2008.

135.    In addition, one of the bases on which the Defendants have denied coverage to LKI is Exclusion C) 2 of the Global Primary Policy which states:

This policy does not cover:

Loss or damage to property separately insured by the Assured, but in the event of such separate insurance carrying a similar exclusion, this Policy will become effective.

136.    Defendants have asserted in their May 3, 2010 letter that the exclusion applies because Angolan rough diamonds (approximately 85% of the total losses sustained by the Plaintiff) were "separately insured by the Assured" under the Angola Policies.   However, in so doing, they ignore the position taken by the Joint Policies Defendants that LKI has no insurable interest for most of the losses and for that reason has no coverage under the Angola Policies.

137.    Joint Policies Defendants, through their letters of April 30, 2010 from Angolan Counsel and May 3 from both New Global Counsel and New Global Excess Counsel have created a coverage "Whipsaw".  On May 2, 2010, Plaintiff's counsel sent to New Global Counsel a copy of the April 30, 2010 letter from Angolan Counsel.  Defendants' reliance on Exclusion C) 2 under the Global Policies in the May 3 letter is inconsistent with the position taken by the Joint Policies Defendants in denying coverage under the Angola Policies.  By letter dated April 30, 2010, the Joint Policies Defendants' Angolan Counsel advised Plaintiff that it has "not satisfied the terms for coverage under the [Angola] Policies".   In that letter, the Joint Policies Defendants asserted that "LKI and its subsidiaries and associated companies do not have an insurable interest under English law in the alleged formal sector losses".   If, as the Joint Policies Defendants assert under the Angola Policies, LKI does not have an insurable interest in the Formal Sector losses, then the diamonds in the Formal Sector that have been physically lost cannot constitute "property separately insured by the Assured" within the scope of Exclusion C)

34

2 in the Global Policies.   Yet, despite that irreconcilable contradiction, Defendants refuse to pay, depriving Plaintiff of its coverage under the Global Policies.

138.   On December 31, 2009, more than eight months after LKI advised Defendants of a possible claim, Defendants, after careful consideration of their exposure to consequential damages for failing to investigate and pay insured losses, agreed to pay LKI $28 million under the Global Policies.   This is an amount approximately $10 million more than all non-Angolan losses claimed.   The Agreement pursuant to which the $28 million was paid, acknowledges that by paying $28 million the Defendants were paying an amount less than what had been sustained and was recoverable by LKI.   This is only possible if Defendants acknowledge that, in addition to the non-Angolan losses of approximately $18 million, some or all of the Angolan losses were also sustained by LKI and agreed to as being recoverable under the Global Policies.   This fact is borne out by the investigation done by the Original Global Counsel and their appointed investigator.   Specifically, upon information and belief, the only area of investigation undertaken by the Defendants during the period from December 31, 2009 through May 3, 2010 (the additional period of time provided for by the Agreement in which Defendants could investigate the losses) was with respect to the Angolan losses which New Global Counsel and New Global Excess Counsel now seek to assert were never covered under the Global Policies anyway.   Upon information and belief, Despite having been provided an exhaustive list of potential witnesses relating to the non-Angolan losses approximately five (5) months earlier, and despite Plaintiff's requests that Defendants investigate all losses, no investigation of non-Angolan losses were undertaken by Defendants.

139.   In addition, Defendants denied coverage under the Global Policies on the basis that "LKI did not seek or obtain insurance from Underwriters for sales not paid by third-parties or for the associated credit risk."   However, Defendants' position is inconsistent with Section 10 of the Global Primary Policy which states, inter alia,:

> 10.3 <u>Basis of Valuation</u>
>
> It is understood and agreed that losses, if any, shall be adjusted as follows:
>
> &ast;        &ast;        &ast;
>
> (iv) . . .
> b)        Goods sold but not yet paid for:  Assured's selling price

140.   In the Agreement, Defendants acknowledged that "LKI *timely* submitted Claims under the Global Policies . . . ." (Emphasis added). Yet, on May 3, 2010, Defendants asserted a purported breach by Plaintiff of Section 4, B)10.(i) of the Global Primary Policy which provides that in the event of loss or damage, notice must be given to Acordia "immediately".

141.   Prior to May 2010, Plaintiff had heard nothing from RGL for over four months.  However, at 8:01 PM on the evening of Saturday, May 1, 2010 only twenty-eight (28) hours before the day on which Defendants were required to provide Plaintiff with their coverage position,  New Global Counsel forwarded to Plaintiff's counsel a letter dated April 30, 2010 from RGL which purported to set forth requests for documentation that had not been provided by Plaintiff in support of the losses.  The transmittal of this May 1, 2010 letter over the weekend, without prior notice, made it impossible for LKI to respond prior to the issuance by New Global Counsel of their letter of May 3, 2010.

142.   RGL's transmittal, by its own writing, did not purport to present the current status of documents delivered to Defendants, stating, among other things: "Please note we have received documents on a weekly and, as in the past week, daily basis.   Therefore, review of these documents is still ongoing and we need to update this report for newly found and digested documents."   In fact, however, the status depicted by RGL had not been properly updated for months.   For example, LKI had provided Original Global Counsel with all applicable Kimberley Process Certificates on January 23, 2010.   RGL's April 30, 2010 letter did not reflect documentation which had already been provided to Defendants no later than January 23, 2010. RGL having spent two entire days with LKI knew that LKI did not have access to documents within the possession and sole control of DD and/or KT yet listed such documents as "missing". Moreover, the RGL correspondence referred to Document Request Lists dated February 18, 2010 and February 28, 2010, neither of which had ever been received by LKI.

143.   As a proximate result of the aforesaid breaches by Defendants, LKI has been unable to conduct its trade in the ordinary course of business, and has lost numerous opportunities to maintain and/or expand its operations.

## FIRST CLAIM FOR RELIEF
## DECLARATORY RELIEF

144.   Plaintiff repeats and reiterates each and every allegation contained in paragraphs "1" through "143" as though fully set forth at length herein.

145.   In order for a loss to fall within the coverage agreement of the Global Policies, an "Assured" must: (1) have suffered "physical loss and/or damage" of "Precious

37

Stones . . . Coins, Cheques, Bills and the like"; (2) "occurring during the period of this Policy" (March 1, 2006 to February 28, 2009); and (3) "arising out of any cause whatsoever".

146.    Plaintiff has submitted voluminous information and documentation to Defendants clearly evidencing that each of those three requirements has been satisfied.   No exclusions are applicable.

147.    Defendants have denied that the losses are covered under the Global Policies.

148.    An actual controversy exists between Plaintiff and Defendants with respect to the rights and obligations of Plaintiff under the Global Policies in connection with the losses.

149.    A declaratory judgment is both necessary and proper in order to set forth and determine the rights, obligations, and liabilities that exist between the parties in connection with the Global Policies.

150.    Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. §§ 2201 through 2202, Plaintiff seeks a declaratory judgment compelling Defendants to provide indemnification in full for all the losses, costs, expenses and interest sustained, or which will hereafter be sustained, to the full extent of the coverage afforded under the Global Policies.

## SECOND CLAIM FOR RELIEF
## BREACH OF THE GLOBAL POLICIES

151.    Plaintiff repeats and reiterates each and every allegation contained in paragraphs "1" through "31", "36" through "80", and "129" through "131" as though fully set forth at length herein.

152.    Based upon the terms and conditions of the "all risk" Global Policies, the losses sustained by Plaintiff are covered thereunder, and Defendants have an obligation to pay Plaintiff in full for those losses based upon the valuation provisions of the Global Policies.

153.    Plaintiff has submitted covered losses to Defendants and provided Defendants with voluminous supporting documentation in its possession and control which are relevant to those losses.

154.    Plaintiff has, at all times, complied with all of its obligations under the Global Policies and has satisfied its burden to establish that the losses are covered thereunder.

155.    Defendants have acknowledged in writing that Plaintiff has suffered in excess of $28 million of losses insured under the Global Policies.

156.    Pursuant to the Agreement, Defendants committed to identify in excess of $28 million of insured losses under the Global Policies, and provide their coverage position with respect thereto by May 3, 2010.

157.    Defendants, by improperly denying coverage for Plaintiff's losses under the Global Policies, have breached the Global Policies.

158.   Defendants have failed to identify covered losses in excess of $28 million and provide Plaintiff with their coverage position with respect to all losses claimed under the Global Policies.  Defendants have also failed to provide any coverage position with respect to losses sustained by LKB.

159.   As a direct and proximate result of Defendant's breach of contract, Defendants have deprived Plaintiff of the benefit of the insurance coverage for which premiums have been paid. Defendants have further breached the Global Policies by failing to pay sue and labor.

160.   As a result of Defendants' breach of contract, Plaintiff has suffered damages in the amount of the value of the covered losses under the Global Policies, sue and labor, plus interest and consequential damages in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF
## BREACH OF THE INTERIM PAYMENT AGREEMENT

161.   Plaintiff repeats and reiterates each and every allegation contained in paragraphs "103" through "112", and "121" as though fully set forth at length herein.

162.   Plaintiff has at all times complied with its obligations under the Agreement.

163.   Defendants have breached the Agreement by failing to pay all amounts due and owing for Sue and Labor.

164.   Defendants have breached the Agreement by failing to provide a coverage position for losses on or before May 3, 2010 as required by the Agreement.

40

165.    As a result of Defendants' breach of the Agreement, Plaintiff has suffered damages in the amount of the balance of its Sue and Labor submissions, plus attorneys' fees, interest and consequential damages.

**FOURTH CLAIM FOR RELIEF**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING OF**
**THE GLOBAL POLICIES**

166.    Plaintiff repeats and realleges the allegations set forth in paragraphs "32" through "35", "81" through "102", and "132" through "143".

167.    Plaintiff has fully performed all the obligations on their part to be performed under the Global Policies, and has complied with all the conditions precedent to the commencement of this lawsuit.

168.    After many months and numerous demands for coverage, Defendants have not timely investigated coverage, nor acknowledged in a timely manner that the losses are covered.   This is true even though Plaintiff provided to Defendants more than enough information to conclusively establish that these losses were covered under the very broad "all risks" provisions of the Global Policies.

169.    For the reasons set forth above, Defendants' failures to timely investigate coverage or acknowledge that coverage is available constitutes a breach by the Defendants of the implied covenant of good faith and fair dealing of the Global Policies.

170.    Moreover, the litany of irrelevant, unnecessary and burdensome requests for information and documents contained in RGL's November 24, 2009 and April 30, 2010 letters, which included requests for documentation that had been previously provided to

Defendants and requests for information and documentation which Defendants knew to be in the sole possession and control of persons or entities other than LKI, is further evidence of Defendants' breach of the covenant of good faith and fair dealing, and was designed to delay the adjustment of the losses, harass Plaintiff and contrive an argument that Plaintiff had failed to cooperate with Defendants' investigation into the losses and had thereby breached the terms and conditions of the Global Policies.

171.    Defendants have not attempted in good faith to effectuate prompt, fair and equitable settlement of the losses despite the fact that Defendants' liability has become clear, evidenced in no small measure by the undisclosed lawsuit initiated in London by the Joint Policies Defendants under the Angola Policies against LKI at the same time the Joint Policies Defendants were continually seeking LKI's cooperation and assistance in their "investigation". Instead, Defendants have acted with conscious disregard for the rights of Plaintiff and in derogation of the reasonable expectations that Defendants would promptly and fully investigate the losses submitted by Plaintiff and provide coverage and payment for all losses under the Global Policies.

172.    Defendants' failure and refusal to proceed with a timely investigation of the losses submitted by Plaintiff, and their unlawful denial of coverage, was in gross disregard of the rights of the Plaintiff in that the Defendants knew or should have known that their failure to proceed with a timely investigation and coverage determination would undercut the very purpose of the insurance agreement and exposed Plaintiff to additional damages that the Global Policies were purchased to protect against.

173.   In such circumstances the Defendants should be liable for any consequential damages that Plaintiff has and in the future may incur as a direct and proximate result of Defendants' gross disregard of the requirements of the terms of the Global Policies and the rights of the Plaintiff in order to place Plaintiff in the position it would have been in had Defendants performed under the Global Policies. Such consequential damages were reasonably foreseeable and within the contemplation of the Plaintiff and Defendants when the parties negotiated the Global Policies.

174.   By reason of the foregoing Plaintiff is entitled to recover from Defendants in excess of One Hundred and Forty Million ($140,000,000.00) Dollars plus pre- and post-judgment interest, Plaintiff's reasonable attorneys fees and any and all other consequential damages that Plaintiff has and in the future may incur as a result of the breach by Defendants of their duties of good faith and fair dealing.

### FIFTH CLAIM FOR RELIEF
### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING OF THE AGREEMENT FOR INTERIM PAYMENT

175.   Plaintiff repeats and realleges the allegations set forth in paragraphs "113" through "120", "122" through "128", and "143".

176.   Plaintiff has fully performed all the obligations on their part to be performed under the Agreement, and has complied with all the conditions precedent to the commencement of this lawsuit.

177.   Defendants' failure to investigate the losses forced Plaintiff to maintain and expand its own Sue and Labor efforts at considerable expense.

43

178.   For the reasons set forth above, Defendants' failure and refusal to pay more than twenty per cent (20%) of Plaintiff's Sue and Labor submissions is arbitrary and capricious, and was nothing more than a contrivance, unrelated to the terms of the Agreement which had no such allocation provisions, and ignored the definition of Sue and Labor in the Agreement.

179.   Moreover, Defendants' new "85% theory" described above which Defendants asserted in an attempt to justify its arbitrary payment of twenty percent (20%) of the Sue and Labor submission, is not supported by the terms of the Global Policies or the Agreement.

180.   The foregoing conduct constitutes a breach by the Defendants of the implied covenant of good faith and fair dealing of the Agreement.

181.   Defendants have not attempted in good faith to effectuate prompt, fair and equitable settlement of Plaintiff's Sue and Labor submission.  Instead, Defendants have acted with gross disregard for the rights of Plaintiff and in derogation of the reasonable expectations that they would promptly and fully pay the Sue and Labor submission in full.

182.   In such circumstances the Defendants should be liable for any consequential damages that Plaintiff has and in the future may incur as a direct and proximate result of Defendants' conscious disregard of the requirements of the terms of the Agreement and the rights of the Plaintiff in order to place Plaintiff in the position it would have been in had Defendants performed under the Agreement.  Such consequential damages were reasonably

foreseeable and within the contemplation of the Plaintiff and Defendants when the parties negotiated the Agreement.

183.    By reason of the foregoing Plaintiff is entitled to recover from Defendants the balance of its Sue and Labor submissions plus pre- and post-judgment interest, Plaintiff's reasonable attorneys fees and any and all other consequential damages that Plaintiff may have or shall hereafter suffer as a result of the breach by Defendants of their duties of good faith and fair dealing.

## SIXTH CLAIM FOR RELIEF
## BREACH OF THE CONFIDENTIALITY AGREEMENT

184.    Plaintiff repeats and reiterates each and every allegation contained in paragraphs "1" through "183" as though fully set forth at length herein.

185.    Plaintiff and Defendants entered into a Confidentiality Agreement as of December 23, 2009 which governed the confidentiality of "Evaluation Material" (as defined therein) that Plaintiff had provided, and would in the future provide, to Defendants in connection with Defendants' investigation and evaluation of the losses under the Global Policies ("Confidentiality Agreement").

186.    Plaintiff has, at all times, complied with all of its obligations under the Confidentiality Agreement.

187.    Section 2 of the Confidentiality Agreement provides in part:

"Underwriters warrant and represent that any such Representative who receives Evaluation Material in accordance with the terms of this Agreement shall only be permitted access to Evaluation Material if such

person has first executed a Non-Disclosure Agreement in the form attached hereto as Exhibit "A", stating that such person has read this Agreement and agrees to be bound by its terms. Counsel for Underwriters shall retain each signed Non-Disclosure Agreement, hold it in escrow, and produce it to counsel for LKI at the conclusion of Underwriters' evaluation of the Losses."

188.   The letter dated May 3, 2010 from New Global Counsel stated: "Underwriters have concluded based on the facts in hand that LKI has not met its burden to show that Underwriters are obligated at this time to make a payment under the policy."

189.   Since Defendants had "concluded" its evaluation of the Losses, Plaintiff's counsel, on May 5, 2010, sent an email to New Global Counsel requesting that Defendants immediately produce all of the signed Non-Disclosure Agreements that they had been holding in escrow.

190.   Despite a further request by Plaintiff's counsel on May 7, 2010, Defendants have failed and refused to produce any such Non-Disclosure Agreements.

191.   Defendants, by improperly failing and refusing to produce to Plaintiff any such Non-Disclosure Agreements, have breached the Confidentiality Agreement.

192.   Section 2 of the Confidentiality Agreement provides as follows:

Underwriters and Representatives acknowledge that remedies at law may be inadequate to protect LKI against any actual or threatened breach of this Agreement, and, without prejudice to any other rights and remedies otherwise available to LKI, Underwriters and Representatives agree that LKI may seek relief for specific performance and injunctive or other equitable relief in LKI's favor without proof of actual damages, and further agree to waive any requirement for the securing or posting of any bond in connection with any such remedy.   Underwriters and Representatives agree to pay for the defense of, indemnify and hold harmless LKI with respect to any damages that result from their breach of

this Agreement (including, without limitation, reasonable legal fees and expenses.

193.  Plaintiff has no adequate remedy at law for Defendants' breach of the Confidentiality Agreement.

194.  As a result of Defendants' breach of the Confidentiality Agreement, Plaintiff seeks specific performance without proof of actual damages, damages in an amount to be determined at trial, plus attorneys fees, interest and consequential damages in an amount to be determined at trial.

**WHEREFORE** Plaintiff demands judgment against Defendants, as follows:

First Claim for Relief, Declaratory Judgment compelling Defendants to pay in full for all the losses, costs, expenses and interest sustained, or which will hereafter be sustained, to the full extent of the coverage afforded under the Global Policies;

Under the Second Claim for Relief based upon breach of the Global Policies compensatory damages in excess of One Hundred and Forty Million ($140,000,000.00) Dollars representing the value of the covered losses under the Global Policies, sue and labor, plus interest and consequential damages in the amount of Five Hundred Million ($500,000,000.00) Dollars;

Under the Third Claim for Relief based upon breach of the Agreement for Interim Payment compensatory damages in the amount of the balance of Plaintiff's Sue and Labor submissions, plus interest, consequential damages in the amount of Five Hundred Million ($500,000,000.00) Dollars, costs, expenses and attorney fees.

47

Under the Fourth Claim for Relief for breach of the implied covenant of good faith and fair dealing of the Global Policies, damages in excess of One Hundred and Forty Million ($140,000,000.00) Dollars, plus consequential damages in the amount of Five Hundred Million ($500,000,000.00) Dollars, all costs and attorney fees, pre-judgment and post-judgment interest.

Under the Fifth Claim for Relief for breach of the implied covenant of good faith and fair dealing of the Agreement, damages in the amount of the balance of Plaintiff's Sue and Labor submissions, plus consequential damages in the amount of Five Hundred Million ($500,000,000.00) Dollars, all costs and attorney fees, pre-judgment and post-judgment interest.

Under the Sixth Claim for Relief for breach of the Confidentiality Agreement, specific performance without proof of actual damages, damages in an amount to be determined at trial, plus attorneys fees, interest and consequential damages.

Dated: New York, New York
       May 18, 2010

HERRICK, FEINSTEIN LLP

By: _____
         Christopher J. Sullivan
         Elliott M. Kroll
         Alan R. Lyons
Attorneys for Plaintiff
2 Park Avenue
New York, New York  10016
(212) 592-1400

48